[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff wife, Diane L. Stevens, commenced this action for a dissolution by complaint returnable September 29, 1992. She alleges that the marriage of the parties has broken down irretrievably and seeks alimony, a property settlement and other relief. The defendant husband, Hugh C. Stevens, admitted in his answer that the marriage had broken down irretrievably, and affirmatively alleged that ground in his cross-complaint. He also seeks a dissolution of the marriage, and an equitable division of property and other relief. The parties also stipulated in writing that their marriage had broken down irretrievably without hope of reconciliation. Both parties were, represented by counsel throughout the proceedings, including trial.
At the hearing, the parties testified, filed financial affidavits, submitted written proposed claims for relief and CT Page 1286 introduced a number of documentary materials into evidence. The defendant also called as a witness the plaintiff's niece Lori Lewis.
The parties also filed a written stipulation in which they agreed, inter alia, to file joint federal and state income tax returns for the calendar year 1993.
From the evidence, the court makes the following findings.
The plaintiff, whose birth name was Diane L. Perkins, married the defendant on September 15, 1979, in Montville, Connecticut. She has resided continuously in this state for at least one year before September 2, 1992, the date of the complaint. All statutory stays have expired and the court has jurisdiction. The parties have no minor children, issue of the marriage, and none were born to the plaintiff since the date of the marriage, and neither party is a recipient of public assistance.
The plaintiff is 37 years of age and a high school graduate. She attended one year of business school education in word processing and bookkeeping at the New London School of Business from which she obtained a certificate. Her physical health is good, but she has been periodically taking medication for her nerves and stress. Her condition does not impair her ability to work or her job performance.
The defendant is 39 years of age and a high school graduate with two years of college. He received an associate's degree. He describes his health as excellent, but he has high blood pressure and takes medication for it daily. His condition also does not impair his ability to work or his job performance.
This marriage of almost fifteen years became dysfunctional in 1990, when the parties' sexual relationship and intimacies ended. The defendant moved out of their bedroom into another, and the parties continued to reside in the family dwelling until late January, 1992, when they finally separated. Each party's version of the other's behavior diverged; each basically placed the blame for the breakdown of the marriage on the other. They did attempt some marital counseling which was short-lived and did not help. They stopped communicating and speaking to each other, and it is clear from the evidence, and the court finds, that their marriage has irretrievably broken down. CT Page 1287
What is not so clear from the testimony is which party's actions or omissions caused the breakdown, and on the state of the record, the court cannot find that either party should bear a greater responsibility for the destruction of their marriage
The plaintiff began her vocational career at age 17,[1]
when she dropped out of high school and worked as a waitress for four or five years. She then worked for a few years as an assembler of medical devices used to perform tracheotomies. From shortly before the marriage to the present time she has worked as a secretary and bookkeeper. She now works for a gasoline station-convenience store operation. She keeps the books of the business, handles the payroll, accounts receivable and payable, and has typical secretarial and bookkeeping responsibilities. From time to time, she has worked part time in second jobs for additional money to pay family bills. There was no evidence introduced of the amount of her annual earnings during the marriage. Presently, she earns $9.90 per hour for a forty-hour week with occasional overtime. She has neither health or life insurance, nor retirement or pension plan or other job benefits. Her financial affidavit reflects gross weekly income of $396 with a net of $307.07.
The defendant has worked for the same employer, M. J. Sullivan Chevrolet, throughout his career, about 22 years. He began as a service station mechanic, became service manager, and now is the service director, and supervises between 40 and 50 employees. He oversees the operation of the dealership's body shop, parts and repairs and service departments. Including bonuses, he earned $47325 gross in 1992 and $46100 in 1993. He has regularly received bonuses over the past five years, although they have varied in amounts, for example in 1993, $11500; in 1992, $14720. So far in 1994, $4400. His financial affidavit reflects $725 per week gross income and $444.02 per week net.[2] The income shown on his financial affidavit does not include the bonus of $4400 recorded on Schedule 4H as received January 28, 1994. This bonus, if annualized, and assuming no additional bonuses in this year, gives him an additional $84.62 per week net income.
The defendant also has substantial benefits associated with his employment. He is provided with a motor vehicle, free of charge, for both personal and business use. All taxes, CT Page 1288 insurance, repairs and gasoline are furnished by his employer. He also enjoys health and life insurance paid for by his employer with dental insurance in part paid for by him. The life insurance policy has a present cash value of $6882. He also has a 401K plan to which his employer contributes two (2%) percent of his annual salary up to a maximum of $800 annually. He is eighty (80%) percent vested in that plan, and the value of his interest in it is about $8350.[3] If he remains employed through 1994, he will be fully vested at the end of this year.
The parties have accumulated substantial assets during their marriage, including three parcels of real estate all of which are jointly owned. The marital dwelling known as No. 1029 East Lake Road, Oakdale, Connecticut, the court finds has a present value of $127500 and an equity of $92500, was purchased in 1980 or 1981 for $65000, using about $12000 in proceeds from the sale of their first home at No. 12 Carolina Circle, Oakdale, which they purchased before their marriage. The plaintiff contributed her $1200 savings to the purchase of the Carolina Circle home, and the defendant also contributed some funds to it, but the amount and manner of his contribution are unclear.
The parties made renovations to the present family home and did much of the work themselves at a cost of about $20000, most of which came from the defendant's funds. There was no evidence of what incremental value, if any, the renovations added to the value of the home.
In 1986, the parties purchased the 9 Waldo Street, New London property, a two-family home, for $92000 with a first mortgage of $72000 and the proceeds of a $20000 second mortgage on the East Lake Road home. They put little, if any, cash into this transaction. The property is now valued at $90500, and with a mortgage balance of $72000[4], has equity of $18500.
In 1988, they purchased a single-family house known as No. 125 Rope Ferry Road, Waterford, Connecticut, from the defendant's father for $69000, when it was in danger of foreclosure, to preserve it as a home for his mother and sister and the sister's children. His mother and sister pay him $700 per month rental which gives him a net cash flow of about $37 per week from that property.
The Rope Ferry Road property is valued at $85000 less a mortgage balance of $66500 and has equity of $18500. CT Page 1289
The court finds that the parties have other assets as follows. Three life insurance policies owned by the defendant with cash values aggregating $13675; his 401K, value $8350; his IRAs of $6200, and his bonus check of $4400. He also has a checking account of $600, personal property and furnishings of $3000. These assets were reported on his financial affidavit.
He also owns some car racing equipment which he claims has no value, about $2500 in automotive mechanic tools, a trailer worth $1000, and twelve firearms worth about $2000 total. These were omitted from his financial affidavit.[5]
The plaintiff uses a 1990 Buick automobile held in joint names, worth $10000, with a loan balance of about $5012, leaving an equity of $4988. She has two life insurance policies with cash values aggregating $3554, an IRA of $3906, $77 in a savings account, and shows jewelry of $5500 and household furnishings of $5,000.
Against these assets, the plaintiff shows a joint debt to CALS of $2812, while the defendant shows only the second mortgage on the dwelling as a liability.
Although no specific annual earnings of either party were introduced into evidence, (except for 1992 and 1993 relating to the defendant) it is evident that the defendant's income was greater than that of the plaintiff during their marriage, and that although each contributed and used their incomes for family purposes and to pay for family needs, the court must conclude that the defendant's monetary contributions to the marriage were greater than those of the plaintiff. Aside from the equal work the parties did on the household renovations, there was no evidence of the extent of either party's non-monetary contributions to the marriage.
The court also finds that the appreciation in value in the family home resulted from general market conditions over the passage of time. The court also infers that the increase in value in the Rope Ferry Road property resulted in part due to a purchase price lower than market value from a less than arm's length transaction between family members in a distress situation.
It is also evident that the defendant has superior CT Page 1290 vocational skills, income and earning capacity than the plaintiff and thus has a far greater opportunity than she has to acquire capital assets and income in the future.
At the present time, even with certain weekly expenses, the defendant is not actually incurring entirely deducted from those shown on Schedule 2 of her financial affidavit (house and yard care, hair care), she would barely be able to meet her necessary living expenses, which are modest. She would be unable to pay her monthly car payment of $358 ($82.68 per week) and monthly second mortgage payment of $284 ($65 per week)[6] from her current income.
At the same time, the defendant has a surplus of net disposable income as previously adjusted, over expenses, of approximately $200 per week, without factoring in his bonuses. He also lives in the two-family dwelling and the rental income received from the other unit subsidizes his shelter expense, which is very modest.
The plaintiff essentially suggests an approximate division of the assets of sixty-one (61%) percent to her, thirty-nine (39%) percent to the defendant, and an order that he pay off the car loan. The parties have also basically agreed, among other things, that the plaintiff should have the family home, the Buick car, and the furnishings and furniture in the home, with the exception of certain items to go to the defendant; the defendant to have the 9 Waldo Street and 125 Rope Ferry Road properties with each party to assume and pay the mortgages on the properties they receive. The plaintiff also requests $1 per year alimony until the car loan is paid and that the defendant maintain and continue her as an insured on his job-related health insurance at his expense.[7]
On the other hand, the defendant suggests that the payment assets be equally divided, with no alimony to either party.
The defendant also claims, in determining the amount of assets to be distributed to each party, that he ought to be given a `credit' in the division for approximately $17,000, for making the monthly car and second mortgage payments on the dwelling from the parties' separation in early 1992 to the present time. He describes these as `gratuitous'; his meaning is that these payments were made without a court order. Although it is undisputed that pendente lite alimony orders were CT Page 1291 not entered and that this action was not commenced until about eight months after he began making these `gratuitous' payments, the court finds the defendant's claim for a `credit' of $17000 unpersuasive. First, the defendant was obligated to make the payments as a co-signer on both debts. Second, a portions[8] of the payments went to increase the parties' equity interests in both the family dwelling and the car, and therefore any credit given would be given twice. Finally, the defendant had an obligation to support the plaintiff during the marriage, by virtue of the marital relationship. The court notes also that, although pendente lite orders were not entered, such a motion for alimony was filed and later reclaimed, but not pursued. The court acknowledges that while these payments may be considered as contributions by the defendant to the preservation or appreciation in value of the parties' respective estates, in view of their nature, they also must be considered as necessary support for a spouse, as she needed both transportation and shelter.
The defendant also urges the court to find that the household furniture, furnishings and certain porcelain dolls which are in the possession of the plaintiff should be valued at $30000 in the distribution of the parties' assets. The evidence that he offers in support of this claim of value is as follows: the dolls were purchased from the Franklin Mint at an original cost of about twelve monthly payments of $60 per doll.[9] He also testified that the personal property was worth more than $30000. In addition, he claims that the plaintiff had shown the value of the personal property as $30000 in her financial affidavit provided for a deposition. While evidence of an item's original cost is relevant to its value, the court finds that in the case of the dolls, there is no credible evidence of their fair market value. The financial affidavit used at the deposition was never introduced into evidence, and the plaintiff, during the deposition, and in her testimony at trial, disavowed the $30000 valuation, and also testified that the defendant himself told her that the $30000 was far too high. The defendant's claim that the plaintiff's furniture and furnishings and miscellaneous personal property are worth $30000 was not proven. There was no evidence that the items were antiques or heirlooms, nor was there an indication that any of the property was other than ordinary used furniture and furnishings.
Rather, the court finds that the values of the tangible CT Page 1292 personal property (excluding the plaintiff's car) set out to each party is roughly in equipoise.
The court has considered the evidence and its findings in the light of the criteria embodied in General Statutes46b-62, 46b-81 and 46b-82 and orders as follows:
A decree dissolving the marriage on the ground of irretrievable breakdown shall enter.
The defendant shall transfer to the plaintiff, by quit claim deed, all of his right, title and interest in and to the family dwelling known as No. 1029 East Lake Road, Oakdale, Connecticut, subject to the two mortgages and other encumbrances thereon which she shall pay and save him harmless therefrom. Simultaneously, she shall execute and deliver to the defendant a promissory note in the amount of $11000 secured by a third mortgage on said premises. Said note and mortgage shall bear interest at the rate of three (3%) percent per annum and the principal and interest shall be due and payable upon the first to occur of the following: sale of the mortgaged premises, or the plaintiff's ceasing to use the premises as her principal residence, her death or remarriage, or if the plaintiff resides in said premises with another person within the meaning of General Statutes 46b-86(b), or January 2, 1999. Said note and mortgage shall contain a thirty day default clause and provisions for attorney's fees in the event of default. The plaintiff shall name the defendant as a mortgagee loss payee on her homeowner's policy, so long as his mortgage remains unsatisfied.
The defendant shall transfer all his right, title and interest in and to the 1990 Buick motor vehicle to the plaintiff, who shall pay the loan thereon except for the monthly payment due February 9, 1994, and save him harmless therefrom.
The plaintiff shall take, have and own, free of any claims of the defendant, all of the furniture, furnishings and tangible personal property located in the family dwelling (except as later set forth); her jewelry; her CNB passbook account; her Metropolitan life insurance policies; and her IRA account.
The defendant shall pay as periodic alimony to the plaintiff the sum of $100 per week for a period of three (3) CT Page 1293 years. Said alimony shall be taxable income to the plaintiff, deductible by the defendant shall terminate upon the plaintiff's death, remarriage, or pursuant to the provisions of General Statutes 46b-86(b) and shall be otherwise nonmodifiable as to duration or amount.
The defendant shall irrevocably designate the plaintiff as beneficiary of the Metropolitan life insurance policy shown on his affidavit in the amount of $25000 with a cash value of $1578 and shall maintain the same without impairment, so long as he is obligated to pay alimony hereunder. He shall execute and deliver a written authorization directed to the insurance company enabling the plaintiff to determine from time to time the good standing of said policy.
The defendant shall maintain the plaintiff as an insured on his job-related group health and medical coverage for the statutory period pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, (COBRA) and/or General Statutes 38a-538, and shall pay one-half the premium thereof; the plaintiff shall pay the other half. These payments by the defendant shall be deemed lump sum alimony.
The defendant shall pay the car payment of $358, due and payable February 9, 1994.
The plaintiff shall transfer to the defendant, by quit claim deed, all her right, title and interest in and to the real estate known as No. 9 Waldo Street, New London, Connecticut, and No. 125 Rope Ferry Road, Waterford, Connecticut, subject to the mortgages and other encumbrances thereon, which he shall pay and save her harmless therefrom.
He shall also own, take and have, free of any claims by the plaintiff, the tangible personal property now in his possession; his three Metropolitan Life Insurance Company policies, excepting the one on which the plaintiff is the irrevocable beneficiary as above stated; his checking account, his IRA accounts, 401K plan and bonus check.
The plaintiff shall turn over to the defendant within thirty (30) days his racing equipment, tools, firearms and personal effects which he shall own and have.
Each party shall pay one-half of the CALS indebtedness CT Page 1294 shown on the plaintiff's financial affidavit.
Each party shall pay his or her own attorney's fees.
All documents or instruments necessary or incidental to the effecting of the orders entered, with the exception of the order related to the joint tax returns, shall be executed and delivered by the parties to each other, as applicable, within thirty (30) days hereof.
The parties have agreed to and shall execute joint federal and state income tax returns for the calendar year 1993. Each shall hold the other harmless for any liability arising out of any information furnished by one to the other. The defendant shall pay to the plaintiff on or before April 15, 1994, the amount of money she would have received had she filed separately.
Teller, J.